UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF VIRGINIA
Roanoke (Abingdon) Division

In Re:

BRANDON LEE CLEVINGER,
HEATHER ANN CLEVINGER,

     Debtors.                                 Case No:  23-70575

ROCKET MORTGAGE, LLC F/K/A QUICKEN LOANS,
LLC F/K/A QUICKEN LOANS INC.,

     Movant,                                Chapter 7

v.

BRANDON LEE CLEVINGER,
HEATHER ANN CLEVINGER,
SCOT S. FARTHING, Trustee,

     Respondents.

<u>NOTICE TO PARTIES IN INTEREST</u>

Notice is hereby given that a Hearing will be held before the United States Bankruptcy Court on November 2, 2023 at 10:30 a.m., or as soon thereafter as counsel may be heard, in the U.S. District Courtroom, U.S. Courthouse, 180 West Main Street, Abingdon, VA 24210, to consider and act upon a Motion of Rocket Mortgage, LLC f/k/a Quicken Loans, LLC f/k/a Quicken Loans Inc. for relief from the automatic stay against Debtors filed herein on behalf of Movant.

                                   ROCKET MORTGAGE, LLC F/K/A QUICKEN
                                   LOANS, LLC F/K/A QUICKEN LOANS INC.

                                   By */s/ Robyn D. Pepin*
                                       Of Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2023, a true copy of the foregoing Notice to Parties in Interest was submitted for electronic transmission to James P Carmody, Attorney for Debtors, and to Scot S. Farthing, Trustee, and was mailed, first class, postage prepaid to Scot S. Farthing, Trustee, at P.O. Box 1315, 490 West Monroe Street, Wytheville, VA 24382 and to Brandon Lee Clevinger and Heather Ann Clevinger, Debtors, at 1070 Virginia Rose Road, Grundy, VA 24614.

*/s/ Robyn D. Pepin*

Robyn D. Pepin, VSB #77784
John J. Chappell, III, VSB #88617
Glasser and Glasser, P.L.C.
Crown Center, Suite 600
580 East Main Street
Norfolk, Virginia 23510
(757) 625-6787
rpepin@glasserlaw.com
jchappell@glasserlaw.com
Attorneys for Rocket Mortgage, LLC f/k/a Quicken Loans, LLC f/k/a Quicken Loans Inc.

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF VIRGINIA
Roanoke (Abingdon) Division

In Re:

BRANDON LEE CLEVINGER,
HEATHER ANN CLEVINGER,

     Debtors.                              Case No: 23-70575

ROCKET MORTGAGE, LLC F/K/A QUICKEN LOANS,
LLC F/K/A QUICKEN LOANS INC.,

     Movant,                             Chapter 7

v.

BRANDON LEE CLEVINGER,
HEATHER ANN CLEVINGER,
SCOT S. FARTHING, Trustee,

     Respondents.

## <u>MOTION FOR RELIEF FROM THE AUTOMATIC STAY</u>

TO THE HONORABLE PAUL M. BLACK:

     Your Movant, Rocket Mortgage, LLC f/k/a Quicken Loans, LLC f/k/a Quicken Loans Inc., respectfully represents as follows:

     1.     That this is a core proceeding within the meaning of the Bankruptcy Code and Rules.

     2.     That on August 28, 2023, the above-named Debtors filed a voluntary Petition for relief in this Court pursuant to Chapter 7 of the Bankruptcy Code.

     3.     That Scot S. Farthing was appointed Trustee of the property, has qualified and is now acting.

4.      That at the time of the filing of the Debtors` Petition herein, the Debtors had an

ownership interest in certain real property and improvements having a street address of 173 S

Allegheny St, Lock Haven, PA 17745-1807, located in the County of Clinton, PA, more

particularly described as follows:

> ALL THOSE CERTAIN parcels of land situate in the Township of Woodward, County of Clinton, Commonwealth of Pennsylvania, bounded and described as follows to-wit:
>
> PARCEL NO. 1:
>
> BEGINNING at an iron pipe on the North line of Water Street in the Village formerly called Dunnsburg, said iron pipe being the Southwest corner of land now or formerly of William Bailey; thence along the North line of Water Street, North 87° 20` West, a distance of 296.2 feet to a point; thence North 14° 40` East, a distance of 7.6 feet to an iron stake; thence along the Dunnstown Cemetery and the brow of the hill, North 70° 50` East, a distance of 189.3 feet to an iron pipe; thence by same, North 61° 40` East, a distance of 141.0 feet to an iron stake; thence by land now or formerly of William Bailey, South 02° 45` West, a distance of 152.0 feet to the place of beginning.
>
> CONTAINING 0.52 of an acre, more or less.
>
> PARCEL NO. 2:
>
> BEGINNING at an iron stake on the South side of Water Street in the Village formerly called Dunnsburg, said iron stake being the Northeast corner of land now or formerly of B. Dolan; thence by the South line of Water Street, South 87° 20` East, a distance of 100.8 feet to a stake; thence South 02° 45`West, a distance of 9.3 feet to an iron stake; thence by the North line of the old Pennsylvania Canal, South 78° 40` West, a

distance of 104.0 feet to an iron stake; thence by other land now or formerly of Robert Smith and Billie Smith, his wife, North 02° 40` East, a distance of 35.0 feet to the place of beginning.

CONTAINING 0.05 of an acre, more or less.

PARCEL NO. 3:

BEGINNING at an iron pipe on the South line of Water Street, said iron pipe being South 87° 40` East, a distance of 100.0 feet along the South line of Water Street from a post corner at the Northwest corner of other land now or formerly of Margaret Rote; thence along the South line of Water Street, North 87° 40` East, a distance of 100.0 feet to an iron pipe; thence along other land now or formerly of Margaret Rote, South 02° 20` West, a distance of 35.0 feet to an iron pipe on the North line of the Pennsylvania Canal; thence along the North line of the Pennsylvania Canal, South 78° 20` (erroneously stated as 5.78° in prior deeds) West, a distance of 103.1 feet to an iron pipe; thence along other land now or formerly of Margaret Rote, North 02° 20` East, a distance of 60.0 feet to the place of beginning.

CONTAINING 4,750 square feet, more or less.

BEING the same premises which Gregory A. Peddigree and Lois M. Peddigree, his wife, by Warranty Deed dated August 25, 2004, and recorded August 30, 2024, in Clinton County in Instrument No. 2004-05110, conveyed unto Brett M. Weaver, in fee.

5.      That the Movant is the holder of a Note dated April 8, 2019, in the original

principal amount of $96,715.00 with interest thereon from said date at the rate of 4.750% per

annum, secured by a Mortgage on the aforesaid real property and improvements recorded among

the land records of the County of Clinton, PA, on which there is an approximate unpaid payoff

balance owing to the Movant of $127,600.32 as of August 30, 2023.  True copies of said Note

and Mortgage are attached hereto and incorporated by reference as Exhibits "A" and "B",

respectively.

      6.    That there is no equity in said real property and improvements for the Debtors`

Bankruptcy estate based upon the valuation of said property established by the County of

Clinton, PA tax assessor of $95,600.00. See Exhibit "C" attached hereto.

      7.    That the Debtors have defaulted in the payments due to the Movant relative to the

aforementioned Note totaling the sum of $21,406.55, inclusive of late charges, insufficient funds

fees, property inspection fees, and foreclosure fees and costs, exclusive of attorney's fees and

costs incident to the filing and prosecution of this Motion.  The Movant reserves the right to

specify any additional payment default or delinquency that may accrue between the filing date of

this Motion and the time of any hearings scheduled with regard to same.

      8.    That in addition to the other amounts due the Movant as reflected in this Motion,

as of the date hereof, in connection with seeking the relief requested in this Motion, Movant has

incurred $1,138.00 in legal fees and costs.

      9.    That in the event the Movant is granted relief from stay hereunder, the  Movant,

its agents and/or representatives, requests that the Order granting said relief allow the Movant,

its  successors  and/or  assigns,  agents  and/or  representatives,  to  send  communications,  as

necessary, to the Debtors, including, but not limited to, notices required by applicable state law

in connection with foreclosure or other proceedings or actions incident to the aforesaid real

property and improvements including any proceedings necessary to recover possession of same from the Debtors.

10.     That further, Movant requests that any Order entered granting relief from the provisions of the automatic stay permit the Movant, its successors and/or assigns, agents and/or representatives, to exercise all rights and remedies with respect to the Note and Mortgage, in accordance with applicable non-bankruptcy law, including loss mitigation, short-sale, deed in lieu of foreclosure, or foreclosure.

11.     That additionally, the Movant requests that any Order entered in this matter authorize the Movant, its successors and/or assigns, agents and/or representatives, to communicate directly with the Debtors with regards to Loss Mitigation, without further Order of the Court.

12.     That the facts hereinabove alleged constitute cause for a grant of stay relief in favor of the Movant pursuant to the provisions of 11 U.S.C. Section 362(d)(1) and are further grounds for relief pursuant to the provisions of 11 U.S.C. Section 362(d)(2).

WHEREFORE, Movant prays that it be granted relief from the provisions of the automatic stay of the Bankruptcy Code with regard to the above-described real property and improvements including any act necessary to recover possession of same from the Debtors; that the Order be binding and effective despite any conversion of this bankruptcy case to a case under any other chapter of Title 11 and that the stay of such grant of relief imposed pursuant to the provisions of Rule 4001(a)(3) of the Bankruptcy Rules be waived.

ROCKET MORTGAGE, LLC F/K/A QUICKEN
LOANS, LLC F/K/A QUICKEN LOANS INC.


By  */s/ Robyn D. Pepin*
    Of Counsel


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2023, a true copy of the foregoing Motion for
Relief from the Automatic Stay was submitted for electronic transmission to James P Carmody,
Attorney for Debtors, and to Scot S. Farthing, Trustee, and was mailed, first class, postage
prepaid to Scot S. Farthing, Trustee, at P.O. Box 1315, 490 West Monroe Street, Wytheville, VA
24382 and to Brandon Lee Clevinger and Heather Ann Clevinger, Debtors at 1070 Virginia Rose
Road, Grundy, VA 24614.


*/s/ Robyn D. Pepin*

Robyn D. Pepin, VSB #77784
John J. Chappell, III, VSB #88617
Glasser and Glasser, P.L.C.
Crown Center, Suite 600
580 East Main Street
Norfolk, Virginia 23510
(757) 625-6787
rpepin@glasserlaw.com
jchappell@glasserlaw.com
Attorneys for Rocket Mortgage, LLC f/k/a Quicken
Loans, LLC f/k/a Quicken Loans Inc.

# Note

Clevinger, Brandon

MERS MIN:

| | | FHA Case No. |
|---|---|---|

April 8, 2019                 Lock Haven                          PA
*(Date)*                          *(City)*                        *(State)*

173 S Allegheny St
Lock Haven, PA 17745-1807
*(Property Address)*

1. **BORROWER'S PROMISE TO PAY.** In return for a loan that I have received, I promise to pay U.S. $96,715.00 (this amount is called "Principal"), plus interest to the order of the Lender. The Lender is Quicken Loans Inc.

   I will make all payments under this Note in the form of cash, check or money order.

   I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2. **INTEREST.** Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 4.750%.

   The interest rate required by this Section 2 is the rate I will pay both before and after any Survival Event as defined in this Note.

3. **PAYMENTS**

   **(A) Time and Place of Payments.** I will pay principal and interest by making a payment every month.

   I will make my monthly payment on the 1st day of each month beginning on May 1, 2019 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest and other items in the order described in the Security Instrument before Principal. If, on April 1, 2049 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date." I will continue to pay those amounts both before and after any Survival Event as defined in this Note, until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.

   I will make my monthly payments at P.O. Box 6577, Carol Stream, IL 60197 or at a different place if required by the Note Holder.

   **(B) Amount of Monthly Payments.** My monthly payment will be in the amount of U.S. $504.52 .

4. **BORROWER'S RIGHT TO PREPAY.** I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

   I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to any accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

FHA Fixed Rate Note-Pennsylvania
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

1/21/2015
VMP1R(PA) (1603).00
Page 1 of 3

EXHIBIT A

5. **LOAN CHARGES.** If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

6. **BORROWER'S FAILURE TO PAY AS REQUIRED**

    (A) **Late Charge for Overdue Payments.** If the Note Holder has not received the full amount of any monthly payment by the end of  Fifteen       calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      4.000% of my overdue payment of principal and interest.

    I will pay this late charge promptly but only once on each late payment.

    (B) **Default.** If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    (C) **Notice of Default.** If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    (D) **No Waiver By Note Holder.** Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    (E) **Payment of Note Holder's Costs and Expenses.** If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees. I will pay the Note Holder back for those expenses paid by the Note Holder both before and after any Survival Event as defined in this Note.

7. **GIVING OF NOTICES.** Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

    Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

8. **OBLIGATIONS OF PERSONS UNDER THIS NOTE.** If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

9. **WAIVERS.** I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

FHA Fixed Rate Note-Pennsylvania
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

1/21/2015
VMP1R(PA) (1603).00
Page 2 of 3

10. **UNIFORM SECURED NOTE.** This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

11. **EFFECT OF SURVIVAL EVENTS.** For purposes of this Note, "Survival Event" is defined as follows:

(A) any default described in Section 6(B) of this Note;

(B) Noteholder requiring me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount under Section 6(C) of this Note;

(C) Noteholder requiring immediate payment in full of all sums secured by the Security Instrument;

(D) the Maturity Date as defined in this Note;

(E) the entry of any judgment against me under this Note; and

(F) the entry of any judgment under the Security Instrument.

This is a contract under seal and may be enforced under 42 PA. C.S. Section 5529(b).
WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ 04/08/2019   *(Seal)*        _____ *(Seal)*
Brandon Lee Clevinger                  **-Borrower**                                **-Borrower**

_____ *(Seal)*                     _____ *(Seal)*
                         **-Borrower**                                **-Borrower**

*(Sign Original Only)*

☐ Refer to the attached *Signature Addendum* for additional parties and signatures.

**Loan Origination Organization:** Quicken Loans Inc.
**NMLS ID:**
**Loan Originator:** Mitchel J Rogowski
**NMLS ID:**

WITHOUT RECOURSE
Pay to the Order of

Quicken Loans Inc.

By

Michelle Butts
Capture Manager

FHA Fixed Rate Note-Pennsylvania
Bankers Systems™ VMP ®
Wolters Kluwer Financial Services

1/21/2015
VMP1R(PA) (1603).00
Page 3 of 3



FILED
CLINTON COUNTY, PA
2019 APR 30 PM 3: 16
JENNIFER L. HOY
REGISTER & RECORDER

**Parcel Number:**
1A-H-0037

**Prepared By:**
Quicken Loans Inc.
Kimberly Polaski
1050 Woodward Ave
Detroit, MI 48226-1906
(313)373-0000

**Return To:**
Document Management
Quicken Loans Inc.
1050 Woodward Ave
Detroit, MI 48226-1906

**Premises:**
173 S Allegheny St
Lock Haven, PA 17745-1807

---

# Mortgage

FHA Case No.

**MIN:**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19, 21 and 27. Certain rules regarding the usage of words used in this document are also provided in Section 15.

**(A)** **"Security Instrument"** means this document, which is dated   April 8, 2019   , together with all Riders to this document.

---

FHA Mortgage With MERS-Pennsylvania

Wolters Kluwer Financial Services, Inc.

9/30/2014
VMP4N(PA) (1810).00
Page 1 of 20

EXHIBIT B

(B)  **"Borrower"** is Brandon Lee Clevinger, a single man

Borrower is the mortgagor under this Security Instrument.

(C)  **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has a mailing address of P.O. Box 2026, Flint, MI 48501-2026, and a street address of 1901 E Voorhees Street, Suite C, Danville, IL 61834. The MERS telephone number is (888) 679-MERS.

(D)  **"Lender"** is Quicken Loans Inc.

Lender is a Corporation
organized and existing under the laws of                the State of Michigan
Lender's address is 1050 Woodward Ave, Detroit, MI  48226-1906

(E)  **"Note"** means the promissory note signed by Borrower and dated April 8, 2019        . The Note states that Borrower owes Lender Ninety Six Thousand Seven Hundred Fifteen and 00/100
Dollars (U.S. $ 96,715.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than        April 1, 2049 .

(F)  **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G)  **"Loan"** means the debt evidenced by the Note, plus interest, and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

FHA Mortgage With MERS-Pennsylvania

Wolters Kluwer Financial Services, Inc.

9/30/2014
VMP4N(PA) (1810).00
Page 2 of 20

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Planned Unit Development Rider
☒ Other  Legal Attached
☐ Rehabilitation Loan Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** **"Secretary"** means the Secretary of the United States Department of Housing and Urban Development or his designee.

**(R)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

County          of          Clinton          :
*(Type of Recording Jurisdiction)*          *(Name of Recording Jurisdiction)*

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.

which currently has the address of
173 S Allegheny St                                        *(Street)*
          Lock Haven          *(City)*, Pennsylvania 17745-1807 *(Zip Code)*
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

FHA Mortgage With MERS-Pennsylvania                                        9/30/2014
Wolters Kluwer Financial Services, Inc.                          VMP4N(PA) (1810).00
                                                                Page 4 of 20

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

   Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as expressly stated otherwise in this Security Instrument or the Note, all payments accepted and applied by Lender shall be applied in the following order of priority:

   First, to the Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly mortgage insurance premiums;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and,

Fifth, to late charges due under the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums to be paid by Lender to the Secretary or the monthly charge by the Secretary instead of the monthly Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

    Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

5.  **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that

Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of

Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that this requirement shall cause undue hardship for the Borrower or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender

FHA Mortgage With MERS-Pennsylvania
Wolters Kluwer Financial Services, Inc.

9/30/2014
VMP4N(PA) (1810).00
Page 10 of 20

may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

11. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

12. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

13. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the

charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment with no changes in the due date or in the monthly payment amount unless the Lender agrees in writing to those changes. Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

14. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

15. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

16. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to reinstatement of a mortgage. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. However, Lender is not required to reinstate if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding; (ii) reinstatement will preclude foreclosure on different grounds in the future; or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects

FHA Mortgage With MERS-Pennsylvania
Wolters Kluwer Financial Services, Inc.

9/30/2014
VMP4N(PA) (1810).00
Page 14 of 20

Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19.

20. **Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower acknowledges and agrees that the Borrower is not a third party beneficiary to the contract of insurance between the Secretary and Lender, nor is Borrower entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable Law.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any

Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.**

23. **Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

25. **Reinstatement Period.** Borrower's time to reinstate provided in Section 18 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

26. **Purchase Money Mortgage.** If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

27. **Effect of Survival Events.** Both before and after any Survival Event, as defined below, Borrower shall:

    (A)  pay Funds for Escrow Items or pay Escrow Items directly as provided in Section 3 of this Security Instrument;

    (B)  pay the amounts and take the actions required by Section 4 of this Security Instrument;

    (C)  maintain insurance coverages and take the other actions required by Section 5 of this Security Instrument;

    (D)  maintain, repair and restore the Property and take the other actions required by Section 7 of this Security Instrument;

    (E)  if this Security Instrument is on a leasehold, comply with all the provisions of the lease;

    (F)  treat any amounts disbursed by Lender under Section 9 of this Security Instrument as additional debt of Borrower secured by this Security Instrument;

    (G)  maintain and pay the premiums for Mortgage Insurance, or make payments to Lender if Mortgage Insurance coverage is not available, and take the other actions required by Section 3 of this Security Instrument;

    (H)  permit the collection and application of miscellaneous proceeds as required by Section 10 of this Security Instrument;

    (I)  pay the fees required by Section 13 of this Security Instrument;

    (J)  continue to abide by the restrictions and take the actions required by Section 21 of this Security Instrument;

    (K)  pay any collection expenses under Section 22 of this Security Instrument; and

    (L)  pay interest at the rate payable from time to time under the Note.

"Survival Event" means any of the following:

(A)  any default described in the Note;

(B)  Lender requiring Borrower to pay immediately the full amount of Principal which has not been paid and all the interest that Borrower owes on that amount under the Note;

(C)  Lender requiring immediate payment in full of all sums secured by this Security Instrument as described in the Note and Sections 17 and 22 of this Security Instrument;

(D)  the Maturity Date as defined in the Note;

(E)  the entry of any judgment against Borrower under the Note; and

(F)  the entry of any judgment under this Security Instrument.

**28.  Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security
Instrument and in any Rider executed by Borrower and recorded with it.

_Brandon Lee Clevinger_ 04/08/2019 _____ (Seal)
Brandon Lee Clevinger                               -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

☐ Refer to the attached *Signature Addendum* for additional parties and signatures.

**Acknowledgment**
**State of** Pennsylvania
**County of** Clinton
This record was acknowledged before me on    April 8, 2019    by
Brandon Lee Clevinger, a single man

Commonwealth of Pennsylvania - Notary Seal
Matthew A. Kranz, Notary Public
Lycoming County
My commission expires October 26, 2021
Commission number 1219168
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

_____
*Notary Public*

*My Commission Expires:*

**Certificate of Residence**
I, _____, do hereby certify that the correct address of the
within-named Lender is 1050 Woodward Ave., Detroit, MI 48226.

Witness my hand this   8   day of  April, 2019.

_____
*Agent of Lender*

**Loan Origination Organization:** Quicken Loans Inc.
**NMLS ID:**
**Loan Originator:** Mitchel J Rogowski
**NMLS ID:**

FHA Mortgage With MERS-Pennsylvania                                          9/30/2014
Wolters Kluwer Financial Services, Inc.                              VMP4N(PA) (1810).00
                                                                     Page 20 of 20

# EXHIBIT "A"

ALL THOSE CERTAIN parcels of land situate in the Township of Woodward, County of Clinton, Commonwealth of Pennsylvania, bounded and described as follows to-wit:

PARCEL NO. 1:

BEGINNING at an iron pipe on the North line of Water Street in the Village formerly called Dunnsburg, said iron pipe being the Southwest corner of land now or formerly of William Bailey; thence along the North line of Water Street, North 87° 20' West, a distance of 296.2 feet to a point; thence North 14° 40' East, a distance of 7.6 feet to an iron stake; thence along the Dunnstown Cemetery and the brow of the hill, North 70° 50' East, a distance of 189.3 feet to an iron pipe; thence by same, North 61° 40' East, a distance of 141.0 feet to an iron stake; thence by land now or formerly of William Bailey, South 02° 45' West, a distance of 152.0 feet to the place of beginning.

CONTAINING 0.52 of an acre, more or less.

PARCEL NO. 2:

BEGINNING at an iron stake on the South side of Water Street in the Village formerly called Dunnsburg, said iron stake being the Northeast corner of land now or formerly of B. Dolan; thence by the South line of Water Street, South 87° 20' East, a distance of 100.8 feet to a stake; thence South 02° 45'West, a distance of 9.3 feet to an iron stake; thence by the North line of the old Pennsylvania Canal, South 78° 40' West, a distance of104.0 feet to an iron stake; thence by other land now or formerly of Robert Smith and Billie Smith, his wife, North 02° 40' East, a distance of 35.0 feet to the place of beginning.

CONTAINING 0.05 of an acre, more or less.

PARCEL NO. 3:

BEGINNING at an iron pipe on the South line of Water Street, said iron pipe being South 87° 40' East, a distance of 100.0 feet along the South line of Water Street from a post corner at the Northwest corner of other land now or formerly of Margaret Rote; thence along the South line of Water Street, North 87° 40' East, a distance of 100.0 feet to an iron pipe; thence along other land now or formerly of Margaret Rote, South 02° 20' West, a distance of 35.0 feet to an iron pipe on the North line of the Pennsylvania Canal; thence along the North line of the Pennsylvania Canal, South 78° 20' (erroneously stated as 5.78° in prior deeds)West, a distance of 103.1 feet to an iron pipe; thence along other land now or formerly of Margaret Rote, North 02° 20' East, a distance of 60.0 feet to the place of beginning.

CONTAINING 4,750 square feet, more or less.

Tax ID / Parcel No.:  1A-H-0037 and 1A-H-0039

BEING the same premises which Gregory A. Peddigree and Lois M. Peddigree, his wife, by Warranty Deed dated August 25, 2004, and recorded August 30, 2004, in Clinton County in Instrument No. 2004-05110, conveyed unto Brett M. Weaver, in fee.

Parcel Number:  1A-H-0037 & 1A-H-0039
Premises:  173 S Allegheny St Lock Haven PA, 17745
**Recording Requested By/Return To:**

Final Docs Team
1050 Woodward Ave.
Detroit, MI 48226

**This Instrument Prepared By:**
Andrew Curd
Rocket Mortgage, LLC
1050 Woodward Ave.
Detroit, MI 48226
Tel. No.: (800) 226-6308 ext. 34780

FILED
CLINTON COUNTY, PA

2023 MAR -3 AM II: 31

JENNIFER L. HOY
REGISTER & RECORDER

# Assignment of Mortgage

    FOR VALUE RECEIVED, Mortgage Electronic Registration Systems, Inc. ("MERS") as mortgagee,
    as nominee for
QUICKEN LOANS INC. ,whose address is 11819 Miami St., Suite 100, Omaha, NE 68164; P.O. Box 2026,
Flint, MI 48501-2026 its successors and assigns, does hereby grant, assign, transfer and convey, unto Rocket
Mortgage, LLC, FKA Quicken Loans, LLC, a corporation      *FKA Quicken Loans Inc.

organized and existing under the laws of  the state of Michigan                    (herein "Assignee"), whose
address is 1050 Woodward Ave. Detroit, MI 48226                    , its successors
and assigns, all its right, title and interest in and to a certain Mortgage dated    April 8, 2019
made and executed by
BRANDON LEE CLEVINGER, A SINGLE MAN

whose address is  173 S Allegheny St Lock Haven PA, 17745
to and in favor of Mortgage Electronic Registration Systems, Inc ("MERS") as mortgagee, as nominee for
QUICKEN LOANS INC., its successors and assigns
                                                                    upon the
following described property situated in  CLINTON                   County, State
of  Pennsylvania            :

        SEE EXHIBIT "A" ATTACHED HERETO AND MADE A
        PART HEREOF SUBJECT TO COVENANTS OF RECORD.

Tax Parcel #: 1A-H-0037 & 1A-H-0039

Mortgage Recorded On:  04/30/2019              Book/Liber#:
Document Number:  2019-01465                   Page#:
**MIN**                        MERS Phone: 1-888-679-6377

MERS Assignment of Mortgage
VMP ®
Wolters Kluwer Financial Services © 2000, 2011

VMP95M (1104).00
Page 1 of 3

such Mortgage having been given to secure payment of
Ninety Six Thousand Seven Hundred Fifteen Dollars and 00/100
                  ($ 96,715.00          ) (Include the Original Principal Amount) which Mortgage is of record
in Book, Volume, or Liber No.                      , at page                   (or as No.
2019-01465                 ) of the                         Records of
                  Pennsylvania          and all rights accrued or to accrue under such Mortgage.
        TO HAVE AND TO HOLD, the same unto Assignee, its successors and assigns, forever, subject only to
the terms and conditions of the above-described Mortgage.
        IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Mortgage on
March 1, 2023

CLINTON  County, State of

                                                        Mortgage Electronic Registration Systems,
                                                        Inc.("MERS") as mortgagee, as nominee for
                                                        QUICKEN LOANS INC. , its successors and assigns

Witness Amanda Koss

Witness Jacob Akers                         By: _____
                                                                    (Signature)

                                                        Name: Heather Ostrander
Attest                                                  Title:  Assistant Secretary of MERS

State of Michigan
County of Wayne
On 03/01/2023, before me Andrew Curd, a Notary Public of Michigan, personally appeared Heather Ostrander,
Assistant Secretary of Mortgage Electronic Registration Systems, Inc. ("MERS") as mortgagee, as nominee for
QUICKEN LOANS INC. personally known to me (or proved to me on the basis of satisfactory evidence) to be
the person(s) whose name(s) is/are subscribed to within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument,
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

        WITNESS my hand and official seal.

                                                        _____
                                                        Name: Andrew Curd
                                                        Title: Notary Public

ANDREW CURD
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF OAKLAND
My Commission Expires October 19, 2026
Acting in the County of Wayne

Assignment of Mortgage

Between:

Mortgage Electronic Registration Systems, Inc. ("MERS")
And QUICKEN LOANS INC.

Rocket Mortgage, LLC FKA Quicken Loans, LLC

Mail To:   Final Docs Team
            Rocket Mortgage, LLC
            1050 Woodward Ave.
            Detroit, MI
            48226

Certificate of Residence

I, Heather Ostrander                    do hereby certify that ASSIGNEE'S precise residence is
1050 Woodward Ave. Detroit, MI 48226.

Witness my hand on March 1st, 2023

_____

ASSIGNEE or Agent for ASSIGNEE

---

# EXHIBIT "A"

ALL THOSE CERTAIN parcels of land situate in the Township of Woodward, County of
Clinton, Commonwealth of Pennsylvania, bounded and described as follows to-wit:

PARCEL NO. 1:

BEGINNING at an iron pipe on the North line of Water Street in the Village formerly called
Dunnsburg, said iron pipe being the Southwest corner of land now or formerly of William
Bailey; thence along the North line of Water Street, North 87° 20' West, a distance of 296.2 feet
to a point; thence North 14° 40' East, a distance of 7.6 feet to an iron stake; thence along the
Dunnstown Cemetery and the brow of the hill, North 70° 50' East, a distance of 189.3 feet to an
iron pipe; thence by same, North 61° 40' East, a distance of 141.0 feet to an iron stake; thence by
land now or formerly of William Bailey, South 02° 45' West, a distance of 152.0 feet to the place
of beginning.

CONTAINING 0.52 of an acre, more or less.

PARCEL NO. 2:

BEGINNING at an iron stake on the South side of Water Street in the Village formerly called
Dunnsburg, said iron stake being the Northeast corner of land now or formerly of B. Dolan;
thence by the South line of Water Street, South 87° 20' East, a distance of 100.8 feet to a stake;
thence South 02° 45' West, a distance of 9.3 feet to an iron stake; thence by the North line of the
old Pennsylvania Canal, South 78° 40' West, a distance of 104.0 feet to an iron stake; thence by
other land now or formerly of Robert Smith and Billie Smith, his wife, North 02° 40' East, a
distance of 35.0 feet to the place of beginning.

CONTAINING 0.05 of an acre, more or less.

PARCEL NO. 3:

BEGINNING at an iron pipe on the South line of Water Street, said iron pipe being South 87°
40' East, a distance of 100.0 feet along the South line of Water Street from a post corner at the
Northwest corner of other land now or formerly of Margaret Rote; thence along the South line of
Water Street, North 87° 40' East, a distance of 100.0 feet to an iron pipe; thence along other land
now or formerly of Margaret Rote, South 02° 20' West, a distance of 35.0 feet to an iron pipe on
the North line of the Pennsylvania Canal; thence along the North line of the Pennsylvania Canal,
South 78° 20' (erroneously stated as 5.78° in prior deeds)West, a distance of 103.1 feet to an iron
pipe; thence along other land now or formerly of Margaret Rote, North 02° 20' East, a distance of
60.0 feet to the place of beginning.

CONTAINING 4,750 square feet, more or less.

Tax ID / Parcel No.: 1A-H-0037 and 1A-H-0039

BEING the same premises which Gregory A. Peddigree and Lois M. Peddigree, his wife, by Warranty Deed dated August 25, 2004, and recorded August 30, 2004, in Clinton County in Instrument No. 2004-05110, conveyed unto Brett M. Weaver, in fee.



# Clinton County

## JENNIFER L. HOY

Register of Wills, Recorder of Deeds
and Clerk of Orphans' Court
2 Piper Way - Suite 239
Lock Haven, PA  17745
Phone: 570.893.4010  Fax: 570.893.4273

## RECEIPT FOR PAYMENT

Instrument Number: 2023-000615                    Receipt Date:    3/03/2023

Instrument Type:   ASSIGNMENT                     Receipt Time:    12:54:47

Indexed Party:     CLEVINGER BRANDON LEE          Receipt No.:

---     ---

### Receipt Distribution

| Fee/Tax Description | Payment Amount |
|---|---|
| ASSIGNMENT | 18.25 |
| ASSIGNMENT - WRIT | .50 |
| J.C.S. / A.T.J. | 40.25 |
| CO IMPROVEMENT FND | 2.00 |
| REC. IMPRVMT FUND | 3.00 |
| Check | $64.00 |
| Total Received........ | $64.00 |

Book#: 2023    Page#: 0615

Paid By Remarks: ROCKET MORTGAGE

# Property Detail Report

## 173 S Allegheny St, Lock Haven, PA 17745-1807
APN: 036-17838

Clinton County Data as of: 02/03/2023

### Owner Information

| | | | |
|---|---|---|---|
| Owner Name: | Clevinger Brandon L | | |
| Vesting: | Individual(S) | | |
| Mailing Address: | 173 S Allegheny St, Lock Haven, PA 17745-1807 | Occupancy: | Owner Occupied |

### Location Information

| | | | | | |
|---|---|---|---|---|---|
| Legal Description: | 37 & 39 | | | County: | Clinton, PA |
| APN: | 036-17838 | Alternate APN: | 1A-H -0037 | Census Tract / Block: | 030300 / 4026 |
| Munic / Twnshp: | Woodward Township | Twnshp-Rng-Sec: | | Legal Lot / Block: | |
| Subdivision: | | Tract #: | | Legal Book / Page: | |
| Neighborhood: | | School District: | Keystone Central School District | | |
| Elementary School: | Woodward El School | Middle School: | Central Mountain M... | High School: | Central Mountain H... |
| Latitude: | 41.14172 | Longitude: | -77.41985 | | |

### Last Transfer / Conveyance - Current Owner

| | | | | | |
|---|---|---|---|---|---|
| Transfer / Rec Date: | 03/27/2019 / 04/30/2019 | Price: | $98,500 | Transfer Doc #: | 2019.1464 |
| Buyer Name: | Clevinger Brandon L | Seller Name: | Weaver Brett M | Deed Type: | Special Warranty Deed |

### Last Market Sale

| | | | | | |
|---|---|---|---|---|---|
| Sale / Rec Date: | 03/27/2019 / 04/30/2019 | Sale Price / Type: | $98,500 / | Deed Type: | Special Warranty Deed |
| Multi / Split Sale: | | Price / Sq. Ft.: | $50 | New Construction: | |
| 1st Mtg Amt / Type: | $96,715 / Federal Housing Administration | 1st Mtg Rate / Type: | 4.3 / Estimated | 1st Mtg Doc #: | 2019.1465 |
| 2nd Mtg Amt / Type: | | 2nd Mtg Rate / Type: | | Sale Doc #: | 2019.1464 |
| Seller Name: | Weaver Brett M | | | Title Company: | None Available |
| Lender: | Quicken Loans INC | | | | |

### Prior Sale Information

| | | | | | |
|---|---|---|---|---|---|
| Sale / Rec Date: | | Sale Price / Type: | | Prior Deed Type: | |
| 1st Mtg Amt / Type: | | 1st Mtg Rate / Type: | | Prior Sale Doc #: | N/A |
| Prior Lender: | | | | | |

### Property Characteristics

| | | | | | |
|---|---|---|---|---|---|
| Gross Living Area: | 2,467 Sq. Ft. | Total Rooms: | 7 | Year Built / Eff: | 1966 |
| Living Area: | 1,983 Sq. Ft. | Bedrooms: | 4 | Stories: | 1 |
| Total Adj. Area: | | Baths (F / H): | 1 / 1 | Parking Type: | Garage |
| Above Grade: | | Pool: | | Garage #: | 2 |
| Basement Area: | 484 Sq. Ft. | Fireplace: | | Garage Area: | 578 Sq. Ft. |
| Style: | Cape Cod | Cooling: | | Porch Type: | |
| Foundation: | Raised W/Crawlspace | Heating: | Hot Water | Patio Type: | |
| Quality: | Fair | Exterior Wall: | Concrete Block | Roof Type: | Gable/Hip |
| Condition: | Average | Construction Type: | Wood | Roof Material: | Composition |

### Site Information

| | | | | | |
|---|---|---|---|---|---|
| Land Use: | SFR | Lot Area: | 26,136 Sq. Ft. | Zoning: | |
| State Use: | | Lot Width / Depth: | | # of Buildings: | 1 |
| County Use: | 101 - 101 | Usable Lot: | | Res / Comm Units: | |
| Site Influence: | | Acres: | 0.6 | Water / Sewer Type: | |
| Flood Zone Code: | Ae | Flood Map #: | 42035C0393E | Flood Map Date: | 06/16/2016 |
| Community Name: | Township Of Woodward | Flood Panel #: | 0393E | Inside SFHA: | True |

### Tax Information

| | | | | | |
|---|---|---|---|---|---|
| Assessed Year: | 2022 | Assessed Value: | $95,600 | Market Total Value: | $95,600 |
| Tax Year: | 2022 | Land Value: | $19,400 | Market Land Value: | $19,400 |
| Tax Area: | 36 | Improvement Value: | $76,200 | Market Imprv Value: | $76,200 |
| Property Tax: | $2.20 | Improved %: | 79.71% | Market Imprv %: | 79.71% |
| Exemption: | | Delinquent Year: | | | |

**EXHIBIT C**



© 2023 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE: FAF